**CV 13 -**     **1770**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

**AMON, CH.J.**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

TYRONE DELIOTTE-SIMPSON,

               Plaintiff,

       -against-

THE CITY OF NEW YORK, PETER
FIGLIUOLO AND JONATHAN EPPS,

               Defendants.

**SCANLON, M.J.**

**COMPLAINT**

**PLAINTIFF DEMANDS
A TRIAL BY JURY**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

Plaintiff, Tyrone Deliotte-Simpson, by his attorneys, Reibman & Weiner, as

and for his Complaint, hereby alleges as follows, upon information and belief:

### PARTIES, VENUE and JURISDICTION

1.      At all times hereinafter mentioned, plaintiff Tyrone Deliotte-Simpson

was an adult male resident of Kings County, within the State of New York.

2.      At all relevant times hereinafter mentioned, defendant City of New

York ("New York City"), was and is a municipal corporation duly organized and existing

under and by virtue of the laws of the State of New York and acts by and through its

agencies, employees and agents, including, but not limited to, the New York City Police

Department ("NYPD"), and their employees.

3.      At all relevant times hereinafter mentioned, defendant Peter Figliuolo

(Tax 946986) was an adult male employed by the City of New York as a member of the

NYPD. Figiuolo is sued herein in his official and individual capacities.

4.      At all relevant times hereinafter mentioned, defendant Jonathan Epps

(Tax 945694) was an adult male employed by the City of New York as a member of the

NYPD. Epps is sued herein in his official and individual capacities.

5.      This Court has jurisdiction of this action pursuant to 28 U.S.C. §§ 1331, 1343 and 1367, and 42 U.S.C. § 1983.

6.      Venue is properly laid, pursuant to 28 U.S.C. Section 1391, et seq., in the Eastern District of New York, where the plaintiff and defendant City of New York reside, and where the majority of the actions complained of herein occurred.

## RELEVANT FACTS

7.      On April 18, 2010, at about 4:00 P.M., plaintiff was arrested inside 315 Livonia Avenue, County of Kings, State of New York.

8.      315 Livonia Avenue is part of the Tilden Houses, a residential housing project owned and/or operated by the New York City Housing Authority ("NYCHA").

9.      Plaintiff had previously resided in Tilden Houses and had various friends in some or all of the eight buildings that comprise the proejct.

10.     Plaintiff had traveled to 315 Livonia with the intention of visiting a friend who had given him a standing invitation to visit whenever he wanted. Plaintiff had similar offers from other friends in various buildings within Tilden Houses.

11.     As he walked towards 315 Livonia he stopped in front of a different building within the project to speak with an acquaintance he had seen near the lobby.

12.     After speaking with this acquaintance for a few minutes, plaintiff continued to 315 Livonia Avenue. The door in the lobby was open and unlocked and so plaintiff entered and traveled to an upper floor where his friend's apartment was located.

-2-

13.     Plaintiff knocked on the door and received no answer.  Having determined that his friend was not home, plaintiff traveled back to the lobby with the intention of leaving the building.

14.     It was at this time that defendants Figliuolo and Epps saw plaintiff.

15.     Epps recognized plaintiff as a current or former tenant at Tilden Houses and immediately stopped and seized plaintiff.

16.     As the defendants later acknowledged, plaintiff was not free to leave following this initial seizure.

17.     Plaintiff, who was not engaged in any unlawful or suspicious activity, explained to the defendants that he had stopped by to see a friend.

18.     Although there was no legal basis to stop, detain or seize the plaintiff, defendants placed the plaintiff in handcuffs and searched him.  The search yielded no evidence of guns, drugs or contraband.

19.     Rather than release him, the defendants threatened to arrest plaintiff for trespassing.  Plaintiff explained that he had gone to his friend's house but that nobody was home and so he was leaving the building.

20.     Plaintiff further explained that, as a former tenant in the building, numerous people in the building had given him a standing invitation to come by and visit.

21.     Plaintiff complied with defendants' demand and gave the defendants his friends's apartment number, and the defendants then went to the apartment number where they knocked on the door and confirmed plaintiff's statement that his friend was not

-3-

home.

22. Despite the absence of any evidence of wrongdoing on the part of plaintiff, the defendants took plaintiff from the premises to process his arrest.

23. The decision to arrest plaintiffs was objectively unreasonable under the circumstances.

24. Defendants then took plaintiff to a local area NYPD service area where he was held for several hours. After a number of hours, plaintiff was transferred to Central Booking, where they were held for many more hours.

25. The individual defendants determined that defendant Figliuolo would be the arresting officer. However, both individual defendants participated jointly in the decision to arrest plaintiff and the arrest itself.

26. Neither Figliuolo nor Epps took any steps to intervene in the plaintiff's arrest, or otherwise mitigate the injuries plaintiff was caused to suffer by the other defendant.

27. As the arresting officer, Figliuolo completed various items of paperwork alleging that plaintiff had loitered in one or more locations and made certain statements to the defendants about his presence in the building.

28. The criminal complaint on which plaintiff was arraigned included false statements of fact made by defendants Figliuolo and Epps including, but not limited to, allegations that he observed the defendant "inside the lobby, beyond the vestibule, of the above-mentioned premises" and that "defendant did not have permission or authority to enter and remain in those premises." These allegations contained in the complaint were false

-4-

and defendants Figliuolo and Epps knew them to be false when they made them.

29.     The factual allegations made by defendants Figliuolo and Epps against plaintiff were materially false and deliberately made to justify the illegal arrest of the plaintiff.

30.     The defendants deliberately communicated these false allegations to the Kings County District Attorney's Office ("KCDA") orally and in writing with the expectation and understanding that the KCDA would commence a criminal prosecution against plaintiff.

31.     As a direct result of the false and fabricated evidence concocted by the defendants, the KCDA commenced the criminal prosecution of the plaintiff for trespassing under Docket Number 2010KN030985.

32.     The plaintiff was required to return to court on numerous occasions on pain of arrest. On or about December 19, 2010, plaintiff was acquitted following trial and the prosecution was terminated in his favor.

33.     It was objectively unreasonable for the defendants to arrest plaintiff, as there was no evidence that he had engaged in any unlawful conduct.

34.     At no time did there exist sufficient cause to seize or arrest plaintiff, nor could the defendants have reasonably believed that such cause existed.

35.     At no time did either of the individual defendants take any steps to intervene in, prevent, or otherwise limit the heretofore misconduct engaged in against plaintiff.

36.     The individual defendants intentionally and deliberately gave false

-5-

statements and/or failed to file accurate or corrective statements, or otherwise failed to report the conduct of the defendants who engaged in the misconduct described herein as required.

37.     That at all times relevant herein, the defendants were on duty and acting within the scope of their employment, and their acts were done in furtherance of the City of New York's interests and without legal justification or excuse.

## FIRST CAUSE OF ACTION

38.     Plaintiff repeats the allegations contained in paragraphs "1" through "37" above as though stated fully herein.

39.     At no time did defendants have any legal basis for initially seizing plaintiff in the lobby of the premises, and there was no reasonable basis to believe said conduct set forth herein was lawful, reasonable, or otherwise appropriate.

40.     At no time did defendants have any legal basis to arrest or imprison plaintiff, or to cause the commencement of criminal process, or otherwise cause the prosecution of plaintiff, nor was there any reasonable basis to believe said conduct set forth herein was lawful, reasonable, or otherwise appropriate.

41.     By so doing, the individual defendants, individually and collectively, subjected plaintiff to seizure, false arrest and imprisonment, malicious prosecution, and denial of a fair trial through the use of fabricated evidence, and thereby violated plaintiff's rights under the Fourth, Sixth, and Fourteenth Amendments of the United States

-6-

Constitution.

42. By reason thereof, the individual defendants have violated 42 U.S.C. §1983 and caused plaintiff to suffer emotional and physical injuries, mental anguish, incarceration and the deprivation of liberty, and the loss of his constitutional rights.

## SECOND CAUSE OF ACTION

43. Plaintiff repeats the allegations contained in paragraphs "1" through "42" above as though stated fully herein.

44. The plaintiff's experience in this case directly result from the NYPD's unlawful trespass enforcement policies and practices in or around NYCHA housing. NYCHA fails to provide adequate building security and instead outsources its security obligations to the NYPD, designating the NYPD as its agent.

45. In the course of patrols on NYCHA property, NYPD officers approach people in or around NYCHA Residences and require them to prove-to the subjective satisfaction of the officer-their residency or their authorization to be in NYCHA residences. If an officer is not satisfied with the results of the initial questioning, the individual can be ejected from the premises or further detained until the individual's authorized presence in the building is confirmed to the subjective satisfaction of the officer. The detention is often accompanied by a frisk and/or search of the individual's person for contraband. The detained person must affirmatively convince the individual officer that the individual has authority to be on NYCHA Residences, in order to avoid arrest for trespass. If

-7-

the individual has not already been searched for contraband pursuant to the seizure, he or she is subject to a search for contraband pursuant to the arrest.

46.     The NYPD's trespass enforcement policies and practices constitute a custom and practice wherein officers stop and question persons they observe without sufficient legal basis, seize persons without reasonable suspicion, and unlawfully arrest individuals for trespass without probable cause.

47.     Upon information and belief, NYPD officers have characterized the lobbies of NYCHA Residences as a "well," or a ready source of subjects to stop, question, and frisk. These encounters, reported in the NYPD's UF-250 forms, are one of the NYPD's indicators of productivity.

48.     Upon information and belief, according to one former officer, "Once they walk into the building, every UF-250 can come from a do-not-enter, meaning entering without a key. . . .But once you ask them for an ID, 90 percent of the people live in the building. That's why the arrest rate is so low. They're not acting suspiciously, but . . . they don't have a key to enter." Rivera, Baker, and Roberts, *A Few Blocks, 4 Years, 52,000 Police Stops,* N.Y.Times, July 11, 2010, at AI.

49.     Upon information and belief, recordings of officers from the 81 Precinct confirm these practices. When discussing a NYCHA building at 120 Chauncey Street in Brooklyn, NYPD officers were told that "no one walks out, out there without being stopped, all right? . . . .They get zero tolerance." 81 Precinct Recordings, which, upon information and belief, were produced in the matter of *Floyd, et al.* v. *City of New York, et al.,*

08 CV 01034 (SAS) ("81 Precinct Recordings"), December 2008.

50.    Upon information and belief, in these recordings, officers also describe criminal trespass as an easy means of increasing arrest percentages by arresting more individuals. An NYPD sergeant was recorded stating that "if they don't belong in Stuy Gardens or any housing buildings, you can lock them up for criminal trespass, all right? If they give you a story about my aunt lives in the third floor, well you're not with your aunt, okay?" 81 Precinct Recordings, November 2008.

51.    Upon information and belief, on October 13, 2008, NYPD officers were advised to make trespass arrests to prevent people from congregating in front of buildings, even if officers have no other basis for detaining those individuals. Upon information and belief, on January 19, 2009, an NYPD sergeant told officers that arresting people for trespass is a way to arrest people who are suspected of committing other crimes. 81 Precinct Recordings, January 2009.

52.    Upon information and belief, according to a survey conducted in 2007 and 2008 by New York Lawyers for the Public Interest in the Thomas Jefferson Houses in East Harlem and the Walt Whitman Houses in Fort Greene, Brooklyn, large numbers of NYCHA residents have been subjected to stops, frisks and/or arrests for trespass. Seventy-two percent of households in the Thomas Jefferson Houses reported that they and their regular visitors had been stopped by police regularly or repeatedly in the previous year. Thirty percent of participating NYCHA households included a person who had been charged with trespassing.

53.     Upon information and belief, between 2004 and 2008, stops on suspicion of trespass on NYCHA residences increased almost fifty percent and trespass arrests in NYCHA residences increased thirty-six percent.

54.     Upon information and belief, according to a review by the Civilian Complaint Report Board ("CCRB") of its files, the substantiation rate for complaints of unlawful stops and frisks in public housing is three times higher than similar complaints from non-NYCHA locations. The CCRB has met with the NYPD to discuss the rise in allegations of improper stops in and around NYCHA buildings.

55.     Upon information and belief, according to the CCRB, the number of complaints received by the CCRB regarding unjustified stops and frisks comprises roughly 30% of the complaints received by the CCRB. In 1999, there were 1,240 complaints for unjustified stops and frisks. That number increased to 5,089 in 2006.

56.     Upon information and belief, based on New York State data, from 2005 to 2008, prosecutors declined to press charges in 11.2% of all trespass arrests in New York City. Although among the nineteen highest-volume crimes, trespass has the fifth-highest declination rate.

57.     In simple terms, the NYPD is aware of and has, either expressly or tacitly, endorsed a policy of using stop and frisks in and around NYCHA residences, such as Tilden Houses, without a reasonable basis for the initial stop, without regard for the frequent violation of the constitutional rights of those stopped, including, in this instance, those of the plaintiff.

-10-

58.     In addition, the NYPD is aware of and has, either expressly or tacitly,

endorsed a policy of arresting people for trespassing in and around NYCHA residences, such

as Tilden Houses, without regard for whether there exists probable cause for these arrests,

and thus without regard for the frequent violation of the constitutional rights of those

stopped, including, in this instance, those of the plaintiff.

59.     In order to substantiate these unlawful arrests, members of the NYPD

often resort to the use of false statements and the fabrication of evidence.

60.     In an Order dated November 25, 2009, in *Colon v. City of New York*,

09-CV-0008 (E.D.N.Y.), the Hon. Jack B. Weinstein stated:

> Informal inquiry by the court and among the judges of this court, as well as
> knowledge of cases in other federal and state courts, has revealed anecdotal
> evidence of repeated, widespread falsification by arresting police officers of
> the New York City Police Department. Despite numerous inquiries by
> commissions and strong reported efforts by the present administration --
> through selection of candidates for the police force stressing academic and
> other qualifications, serious training to avoid constitutional violations, and
> strong disciplinary action within the department -- there is some evidence of
> an attitude among officers that is sufficiently widespread to constitute a
> custom or policy by the city approving illegal conduct of the kind now
> charged.

61.     Furthermore, more than half the time that the Civilian Complaint

Review Board refers substantiated complaints against officers to the NYPD for disciplinary

action, the NYPD either simply issues a verbal warning or drops the charges altogether.

62.     It is therefore clear that the municipal defendant has not only tolerated,

but actively fostered a lawless atmosphere within the NYPD and that the City of New York

was deliberately indifferent to the risk that the inadequate level of supervision would lead to

the violation of individuals' constitutional rights in general, and caused the violation of

plaintiff's rights in particular.

       63.     By reason thereof, defendant has violated 42 U.S.C. §1983 and caused

plaintiff to suffer emotional and physical injuries, mental anguish, incarceration and the

deprivation of liberty, and the loss of his constitutional rights.

## DEMAND FOR A JURY TRIAL

       Pursuant to Fed. R. Civ. P. 38, plaintiff hereby demands a jury trial of all issues

capable of being determined by a jury.

WHEREFORE, the plaintiff demands judgment against defendants jointly and

severally as follows:

     i.  on the first cause of action, actual and punitive damages in an amount
        to be determined at trial;

     ii.  on the second cause of action, actual damages in an amount to be
        determined at trial;

     iii.  statutory attorney's fees pursuant to, *inter alia*, 42 U.S.C. §1988 and
        New York common law, disbursements, and costs of the action; and

     iv.  such other relief as the Court deems just and proper.

Dated: Brooklyn, New York
    April 1, 2013

          Reibman & Weiner
          Attorneys for Plaintiff

       By:  _____
          Michael Lumer (JM-1947)
          26 Court Street, Suite 1808
          Brooklyn, New York 11242
          (718) 522-1743